OMAHA WATER CO. v. CITY OF OMAHA. SAME v. CITY OF OMAHA et al.

(Circuit Court of Appeals, Eighth Circuit. November 8, 1907.)

Nos. 2,499, 2,500.

1. CONTRACTS—CONSTRUCTION—CONTRACT BETWEEN CITY AND WATER COMPANY
—ACCEPTANCE OF PERFORMANCE.

Where the ordinances and contract with a city under which a water company constructed its plant contained full specifications for the system, furnished by the city, including the source of supply, specifications for the settling basins, location and size of mains, location of fire hydrants, etc., leaving practically nothing to the discretion of the company so far as the efficiency of the system depended upon engineering problems, and the works when completed were tested and accepted by the city as in compliance with the contract, and were operated for a number of years without complaint on its part, provisions of the contract requiring the company to furnish sufficient pressure for fire protection through the hydrants, and to furnish pure water for domestic uses, must be construed in the light of such facts, and after the lapse of 25 years, during which the company has substantially complied with such requirements, it cannot be charged with violation of the contract because of objections to the quality of the water made after a controversy has arisen between the parties, nor because of a failure to maintain the required pressure, where, owing to the large extension of service pipes, that cannot be done without injury to such pipes and the plumbing in buildings supplied.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, § 1468.]

2. SAME—ACTION FOR CONTRACT COMPENSATION—SUBSTANTIAL PERFORMANCE.

Substantial performance of a contract by one party, coupled with retention of the benefits thereof by the other, will authorize an action by the former to recover the contract compensation, and in such case recovery may be had on an averment of full performance, though the proof falls short of showing it; the remedy of the latter being by counterclaim or by an independent action for damages.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, §§ 1361, 1731.]

3. MUNICIPAL CORPORATIONS—CONTRACT OBLIGATIONS.

A municipal corporation in respect of its purely business relations as distinguished from those that are governmental is held to the same standard of just dealing that the law prescribes for private individuals.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 36, Municipal Corporations, § 695.]

4. CONTRACTS—DUTY OF PERFORMANCE—DEFAULT OF OTHER PARTY.

One party to a continuing contract of mutual and dependent covenants cannot require the other to perform executory stipulations, while he persists in defaults and compels the other to seek the aid of the courts for compensation due for those he has already executed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, §§ 1207–1215.]

5. SAME.

By a contract between a city and a water company the city was required to pay the company rentals for fire hydrants on the 1st of January and July of each year, and the company was required to install additional hydrants whenever ordered by the city, no time being fixed, however, within which it should comply with such orders. From August to December of one year the council ordered the installation of 117 new hydrants, and the company by January 1st following had installed 49 of the same and in doing so laid four miles of new mains. January 1st the city made default in payment of the rentals then due, and had also made pre-

vious defaults, and by failing to provide for raising money for such rentals and by transferring the balance remaining in the fund to another fund had clearly indicated its intention not to pay the same. *Held* that, under the contract, the company was entitled to a reasonable time in which to install new hydrants when ordered, and that, so far as appeared, it had used reasonable diligence in that respect up to January 1st, that the default of the city on that date, and the previous defaults and acts indicative of the purpose of the city not to pay in the future, justified it in refusing to install the remaining number ordered, and that its action neither before nor after that date constituted a breach of the contract which precluded it from recovering the rentals due then or thereafter.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, §§ 1207–1215.]

In Error to the Circuit Court of the United States for the District of Nebraska.

See 147 Fed. 1, 77 C. C. A. 267.

R. S. Hall and Howard Mansfield (Herbert C. Lakin, on the brief), for plaintiff in error.

John Lee Webster and Carl C. Wright (Harry E. Burnam, on the brief), for defendants in error.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

HOOK, Circuit Judge. The Omaha Water Company brought two actions against the city of Omaha, the first for hydrant rentals for the six months ending December 31, 1904, and the other for like rentals for the six months ending June 30, 1905. They were brought shortly after the accrual of the sums sued for respectively. The water board of the city of Omaha which had recently been created a corporation by legislative act, and vested with certain powers respecting the municipal water supply, was joined as a defendant in the second action. The aggregate amount claimed was $94,240.48. It was not denied that, aside from the specific defenses in the answers, the sums sued for were due and owing. The answers of the city set forth that the contract between it and the company which was the basis of the actions required of the latter the continued performance of certain duties, and that it had failed in three material particulars: (1) To furnish ample fire protection through hydrants without the aid of hand or steam engines. (2) To furnish pure, wholesome, clear water suitable for culinary and drinking purposes. (3) To install new hydrants upon new mains as ordered by the municipal authorities. The answer in the second action also contained a counterclaim for $81,645.68 for damages for the failure of the company in the first of the particulars mentioned, it being averred that, because of the inadequate fire protection, the city had been compelled to expend that sum in the purchase and maintenance of fire engines, etc. The actions were tried together. At the conclusion of the evidence, the trial court upon motion for directed verdicts held that the city had not made out its first and second defenses, and therefore denied recovery upon the counterclaim predicated upon the matters set out in the first defense. On the other hand it held that the company had failed to install new hydrants ordered by the city, that no legal excuse therefor had been shown, and that, while in the position

of violating the contract, it could not recover upon the contract for the rentals of the hydrants it had installed. Verdicts for the defendants were directed and judgments rendered against the company on its causes of action and a judgment against the city on its counterclaim. The city acquiesced in the result, but the company prosecuted these writs of error.

Upon the theory that if the trial court should have directed the verdicts upon any ground its action should be affirmed, though it selected the wrong one, we have considered all three of the defenses of the city, and have reached the conclusion that the court was right in its decision upon the first two of them. By the contract and ordinances pursuant to which the waterworks were built in 1880–83 by predecessors in title of the water company, and in which the municipal franchise was granted, the character and style of the works and the source from which the water supply was to be obtained were definitely prescribed. The contract and ordinances left very little to the judgment and discretion of the builder, and practically nothing so far as the efficiency of the system depended upon the correct solution of engineering problems. Before the ordinances were adopted and the contract was made, a hydraulic engineer was employed by the municipal authorities to study the topography of the city and devise a plan for a system of waterworks. In May, 1880, he submitted to the city council an exhaustive report describing with much detail the results of his labors. The report and an amendment thereto were afterwards embodied in the contract, and referred to and made a part of the ordinances. The material features of the report were as follows: The water for all purposes was to be secured from the Missouri river and the point of intake where the pumping station was to be installed was designated. The character of the buildings at the pumping station and the capacity of the pumps were specified. The storage and settling reservoirs were located, their number and capacity given, and the elevations of the former above low water-mark of the river and above the various portions of the city were set forth. The main or pipe system was described in minute detail. The names of the streets in which the pipes were to be laid, the distances to be traversed, the size of the pipes in each street, and the precise location of the first 247 fire hydrants were shown. The report also contained tables showing the discharge capacity of water mains or pipes of specified diameters and lengths, and also the distances fire streams could be thrown with stated pressures at the hydrant heads through hose of different lengths, and nozzles of different diameters. The character of Missouri river water, its excellence for drinking and domestic purposes, and the ease of clarifying it were discussed. In short, the report which concluded with an itemized statement of the estimated cost furnished almost complete plans and specifications for the entire works. The distribution system was designed for both fire protection and private consumption. In other words, there was not to be a separate system of mains and pipes for each. The difficulties in depending wholly upon direct hydrant pressure for fire protection were pointed out. It was said that in a large, densely populated city it could scarcely

be considered a safe reliance; that the friction caused by the transmission of the water through an extensive pipe distribution and the depletion by daily consumption would necessitate an immense initial pressure as the city grew. It was said that the experience in many cities was that reliability upon direct hydrant service was diminished proportionately to the increase of the demand for current supply. Hydrant service as a sole reliance for fire protection depended upon one or both of two things, namely, the gravity pressure resulting from the elevation of the reservoirs and direct pressure from the pumps of the waterworks. The maximum gravity pressure was fixed by the elevation of the reservoirs, and therefore not the subject of increase, though its efficiency depended greatly upon the judicious arrangement of the pipe system and the location of the hydrants. As the city grew, this pressure was subject to great impairment by the increase of friction in the increase of the pipes and by the constant withdrawal of water by consumers. On the other hand, it was stated that direct pressure from the pumps was always more or less objectionable. The contract and ordinances required that the works should be of capacity and power to throw streams of water to specified heights from hydrants at designated points. When the works were completed in 1883, they were subjected to these tests, and were accepted by the city as complying with all requirements. In the fall of 1905, after these actions were begun, the city authorities made tests of the pressure at the hydrants, and it is contended that they disclosed that the pressure was deficient, and did not reach the contract standard. On the other hand, the company claims that it was not contemplated that the pressure specified in the contract should be maintained longer than a year after the completion of the works, also, that the last tests of the city were ex parte, without participation on the part of the company; and that it was not requested to and did not re-enforce the gravity pressure by direct pressure from the pumps. However this may be, we think that the trial court was right in holding the evidence showed that the maintenance of the pressure sought by the city would be injurious to the service pipes and the plumbing in the buildings of the city, and that, as private consumers were furnished through the same mains that afforded fire protection, it could not have been contemplated that a pressure should be maintained for one which would be destructive of the other; and this notwithstanding there was language in the contract and ordinances tending to the contrary. This seems to have been the construction voluntarily put by the city upon the contract and ordinances as early as 1885, when it purchased a fire engine and commenced the establishment of a fire department. Other engines were purchased from time to time thereafter, and by such means the pressure that was lacking at the hydrant heads was supplied by the engines on occasions of fire.

It was also claimed that the company failed to perform its obligation to furnish pure, wholesome, clear water, and therefore there could be no recovery upon the contract. No special damages were alleged to have been sustained by the city on this account, but performance by the company was asserted as a condition precedent to its re-

covery upon the contract. It is conceded that the water was taken from the source prescribed, namely, the Missouri river, and it was shown that settling basins, also prescribed, were used by the company, and were the means employed to purify and clarify the water ever since the works were installed. It may be admitted that it was a continuing duty of the company to make the water as clear and potable as was reasonably practicable, and to that end to adopt such new and approved methods as came into use from time to time, yet it appeared that but twice in more than 20 years did the municipal authorities make complaint of the character of the water that was being furnished. In 1896 the city brought suit to forfeit the franchise upon the precise grounds set up in the first and second defenses now under review, namely, insufficiency of pressure and impurity of water. In the following year the suit was determined against the city on the merits. For nearly eight years thereafter no further complaint was made. In June, 1905, near the end of the rental period covered by the second action now under review, the water board served upon the company a notice to increase the pressure and to furnish clear water. This notice was evidently a mere tactical move in the midst of controversy and litigation. It required compliance within 10 days, though manifestly if the means employed for many years, without objection, to make the water clear, had been insufficient, the adoption of new processes would have taken much more time than that allowed. Moreover, the notice was given while proceedings, commenced by the city, were on foot for the acquisition of the works under a right of purchase. The notice does not lessen the substantial accuracy of the statement that during the period covered by the actions and for years prior the city accepted the service without complaint either of the quantum of pressure or of the character of the water itself. There was a substantial performance by the company of its contract obligation to furnish clear and wholesome water coupled with retention of the benefits, and silent acquiescence on the part of the city. Even if it were true, as contended, that the company did not in full measure perform its duty, nevertheless under the facts shown it may maintain an action upon the contract to recover the accrued hydrant rentals, and the city is remitted to an affirmative assertion and proof of damages sustained. It is well settled that substantial performance of a contract by one party coupled with retention of the benefits thereof by the other will authorize an action by the former to recover the contract compensation; that in such case recovery may be had upon an averment of full performance though the proof falls short of showing it; and that the remedy of the latter is by counterclaim for his damages or by an independent action before he is sued. City of St. Charles v. Stookey (C. C. A.) 154 Fed. 772.

The remaining question arises from the failure of the company to install the additional hydrants ordered by the city. The hydrant rentals sued for were for the last six months of 1904 and the first six months of 1905. During the former period, the city ordered the company to place 117 new hydrants, to do which involved the laying of a large amount of new water mains. The company obeyed the orders to the extent of 49 hydrants and the requisite mains. On January 1,

1905, the remaining 68 hydrants had not been placed. The city asserted the failure of the company as a complete defense to the actions for rentals of hydrants previously placed and in service. The company replied, denying that it had defaulted in its duty, and asserting that the city first broke the contract by failing to make payments due and owing it, also that the orders for more hydrants were beyond the lawful authority of the city, and entailed indebtedness it had no legal power to contract. The trial court held that the failure of the company to install all the hydrants ordered, being a failure to perform a duty imposed by the contract, was without sufficient excuse, that its actions upon the contract could not be maintained, and that since it did not seek a recovery upon the quantum meruit verdicts should go for the city.

The facts pertaining to this feature of the case are as follows:. The original contract of 1880 between the city and a predecessor of the company provided for the installation of 250 hydrants at designated places, and that others on new mains might thereafter be required by the city, and, when so required, should be placed and maintained by the company at an annual rental of $60 per hydrant. As the city grew, the number of hydrants put in service greatly increased, until on July 1, 1904, there were about 1,500 of them, requiring payment to the company of about $90,000 a year, payable on the 1st days of January and July. From the time the contract of 1880 was made to 1903 there was power in the city, expressly conferred by legislative act, to levy and collect taxes for the payment of the hydrant rentals. One of the ordinances incorporated in the contract provided that after 20 years the city should have the right to purchase the waterworks at an appraisal by three engineers. The Legislature of Nebraska passed an act, which was approved February 2, 1903, authorizing the city to acquire the works, creating a water board for the management thereof, and repealing every provision of law for the levy and collection of taxes for hydrant rentals. Of course, this act could not impair the obligation of the city in respect of hydrants theretofore installed. But it is, in effect, contended by the company that since the city was not required by the contract of 1880 to order the location of additional hydrants, since it might do so or not as it pleased, it was in respect of the exercise of its discretion subject to the dominant control of the Legislature; that the company had no vested contract right to have new hydrants ordered, and, if the city could say it would not order them, the Legislature could say it should not; finally, that the withdrawal from the city of the means of payment was equivalent to a prohibition against incurring the new indebtedness. We have not, however, found it necessary to determine this question.

Pursuant to the act of 1903, the mayor and council adopted an ordinance February 24, 1903, electing to purchase the waterworks. An appraiser was appointed for the city, the company appointed one, and the two chose a third. During the progress of this litigation and the causes that led to it the appraisers were engaged in the performance of their duties, an appraisement not having been finally agreed upon. When the hydrant rentals became due July 1, 1903, the city defaulted in payment, and the company had to sue for them. Like default was

made January 1, 1904, and again the company sued. Judgments were confessed, and, after mandamus proceedings to compel the city to levy taxes to pay them, they were paid in February, 1904. The rentals due July 1, 1904, were paid a few days later. The mayor of the city in an official communication to the city council said that the moneys with which the payment was made were raised under the mandatory order of a court. This left a small balance in the water fund. The city levied no tax to pay future hydrant rentals, though necessarily provision for funds should have been made in advance. Not only this, but in November, 1904, while the city council was ordering many new hydrants, the balance in the water fund, then amounting to about $10,000, was by the order of that body transferred to the general fund. As ordinances ordering the company to install new hydrants were passed, the mayor vetoed them, calling attention in one instance to the fact that there was no money in the water fund, no money in sight, and no provision of law for the levy of taxes, also that it would cost the company over $27,000 to install the 55 hydrants required by the ordinances then in question. The ordinances were passed over the mayor's veto.

We pass the question whether the company could lawfully be required to make extensive additions and improvements after the election of the city to purchase and while proceedings for its consummation were under way, or whether the duty of the company in such case was merely to preserve the integrity of the works and efficiently operate them as they stood when the election was made. There was substantial evidence that the city did not intend voluntarily to pay the rentals either of the old hydrants or of the new ones it ordered. It had recently defaulted in payments, and had compelled the company to engage in litigation. It diverted the balance in the fund specially collected for the purpose, and it made no definite provision, as the law required, for the indebtedness that was accruing from month to month. When the rentals for the last half of 1904 fell due, the city did not pay them, and the company brought one of these actions for their recovery. We do not think the contention that the city was justified in refusing to pay because the remaining hydrants had not been placed can be sustained. The contract prescribed no time within which new hydrants should be installed on new mains after being ordered by the city, and the company was therefore entitled to a reasonable time for performance of its duty in that particular. Whether the company committed a breach of its contract by failing to install all of the hydrants involves a consideration of the number ordered, and what would be a reasonable time in view of the season of the year. There were 117 ordered between July 12 and December 20, 1904. Of these the company installed 49, and to do so laid about four miles of new mains before January 1, 1905. We find no evidence that this was not a reasonable performance by the company of its duty. It cannot be assumed that the company broke its contract merely because on January 1, 1905, 68 of the hydrants ordered during the preceding six months had not yet been placed. No contract or ordinance imposed upon the company the duty to place all hydrants ordered within any fixed and limited time. The company not appearing to have been in

default on January 1, 1905, the city should have paid the rentals due on that day, but it did not do so and the first of the actions now under review was brought. The failures of the city to pay were not unimportant in their relation to the contract as an entirety, nor can they be ascribed to mere chance or oversight. There was manifested a purpose to withhold performance of stipulations that were material to the interests of the company.

A municipal corporation, in respect of its purely business relations as distinguished from those that are governmental, is held to the same standard of just dealing that the law prescribes for private individuals. One party to a continuing contract of mutual and dependent covenants cannot require the other to perform executory stipulations while he persists in defaults and compels the other to seek the aid of the courts for compensation due for those he has already executed. Construction Co. v. Seymour, 91 U. S. 646, 23 L. Ed. 341; Cort v. Ambergate, etc., Ry., 17 Q. B. 127.

When the company declined to install the remaining hydrants after the series of defaults in payment by the city, it did not thereby wholly discard the contract and deprive itself of its right of action upon the contract for the rentals previously earned. When there is part performance, an action upon the contract will lie if absolute performance has been dispensed with. District of Columbia v. Camden Iron Works, 181 U. S. 453, 21 Sup. Ct. 680, 45 L. Ed. 948.

The judgments are reversed, and the causes remanded for a new trial.