### WEICKER v. BROMFIELD, and seven other cases.

Circuit Court of Appeals, Tenth Circuit. August 7, 1929.

Nos. 29–34, 36, 37.

G. Dexter Blount, of Denver, Colo. (Harry S. Silverstein and David Rosner, both of Denver, Colo., on the brief), for appellant Bourk.

Hudson Moore, of Denver, Colo., for other appellants.

Ralph Hartzell, of Denver, Colo., for appellee.

Before LEWIS, COTTERAL, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge. These eight appeals involve the same controversy. The cases were consolidated for trial and on this appeal. All are actions at law, tried to the court without a jury, and findings of fact made. The notes involved here are a part of a bunch of notes which were among the assets of the Globe National Bank at the time of its failure on September 19, 1925. The receiver sued on the notes in six of the cases. In two of the cases the Globe National Bank had negotiated the notes to purchasers for value before maturity and the makers paid the notes. In one of such cases, No. 37, Donaldson sued the receiver to recover the payment made to such purchaser for value; in the other, No. 29, Weicker was sued on two notes not in dispute, and counterclaimed for the amount of the note he had paid to a purchaser for value, such note being one of those in dispute; and also counterclaimed for the amount of two small deposits. If his counterclaim is good on its merits, his right to set it off is not challenged. In case No. 33, Knifton, denying the right of the receiver to recover on the note sued on, counterclaimed for a deposit of $170. In case No. 36, Bartlett had given his note for $17,333.34 (one of the notes in dispute), had paid thereon the sum of $13,000, and was sued for the balance. He denied the right to recover on the balance, and counterclaimed for the amount paid. In case No. 30, Bourk filed a similar counterclaim for a deposit of $1,827.-74. In the cases where affirmative relief is sought against the receiver, the note makers allege breach of contract, resultant damages, and pray for a money judgment, which they ask to have decreed a first lien upon all the assets in the hands of the receiver.

While the issues as joined involve some collateral matters, such as notes not in dispute and deposits, the only controversy presented is over eight notes, aggregating $186,000 face value, which came into the possession of the Globe National Bank on July 6, 1925. In this opinion, the Globe National Bank will be referred to as the Globe Bank, the Home Savings & Merchants' Bank (a state banking institution) as the Home Bank, and the appellants as the note makers.

The pleadings are not identical in form, but in substance they are the same. The note makers (a) deny that the receiver is the lawful owner of such notes; (b) allege absence of consideration; (c) allege that the notes were given in pursuance of an agreement by the terms of which the Globe Bank agreed to pay all the indebtedness of the Home Bank; agreed to forthwith deliver to the Home Bank notes of a par value in excess of $200,000; agreed to deliver to the Home Bank other notes of a par value in excess of $500,000 as soon as an aggregate sum of about $190,000 had been collected thereon by the Globe Bank; and agreed that it would not foreclose or dispose of the last-mentioned notes without first giving 120 days notice to representatives of the Home Bank. The an-

swers allege that the Globe Bank violated this agreement in all particulars. One or two of the makers allege a wrongful delivery of the notes to the Globe Bank.

The trial court found for the receiver, and this appeal follows.

The essential facts are not in dispute. The note makers were directors and stockholders of the Home Bank, and early in 1925 were undertaking to dispose of the bank to some institution which would assume and pay its obligations, and thus relieve them of their statutory liability as stockholders and at the same time protect their business reputations. In May of that year they asked Mr. G. E. Armstrong, a national bank examiner, to examine their bank. His report estimated the losses to be $891,235.57. The capital, surplus, and undivided profit account amounted to $503,803.84. He reported that the bank was insolvent, as in fact it was. July 1st was an interest-paying date on savings accounts, and, as that day approached, the efforts to sell the bank became more marked. Other efforts failing, negotiations were opened with the Globe Bank, a smaller but then solvent institution. Any deal with the Globe Bank necessarily involved the approval of Mr. Armstrong, who was in touch with the situation at all times. On July 2d a meeting was held, attended by the officers of both banks, their counsel, and all of the directors of both institutions excepting three or four. What happened at that meeting is testified to by the directors of the Home Bank and is not denied by the directors of the Globe Bank, although some of them were on the stand. Out of that meeting there emerged a plan, agreed to by both institutions, which was that a new state banking institution should be incorporated, to be called the "Globe Trust Company," which was to take over both the Globe and Home Banks, and which would start business in the quarters of the Home Bank on Monday morning, July 6th. Officers of the new trust company were agreed upon and the trust company chartered on July 3d. The Globe Bank could not go into the merger, however, until the assets of the Home Bank were replenished. This was provided for by an agreement of the note makers to put up $186,000. For this $186,000, the note makers were to receive approximately $700,000 face value of notes and securities then belonging to the Home Bank, and which Mr. Armstrong had criticized. In addition, they were to receive 172 shares of the stock of the Globe Trust Company, and the Globe Trust Company was to assume the obligations of the Home Bank, and take over all its other assets. The note makers agreed to repay themselves for their $186,000 advanced out of the $700,000 of criticized paper, the balance realized thereon to go to the stockholders of the Home Bank. In pursuance of that agreement, the notes in suit, and others, were executed. They were "myself" indorsed notes, transferable by delivery. They were intrusted to one of their number, Carl Ph. Schwalb, for delivery to the Globe Trust Company, in accordance with the agreement, excepting one or two which were made after it was known that the Globe National would go ahead with the plan, instead of the trust company; but as to these one or two notes, that was the only change in the conditions authorized by the makers.

On Saturday July 4th and Sunday July 5th the Globe Bank moved into the Home Bank. When they moved in, the plan was to open the morning of July 6th as the Globe Trust Company. Sunday evening the plan was changed by the officers of the Globe Bank and Mr. Armstrong, the bank examiner. Mr. Gates, the president of the Globe Bank, and a witness for the receiver, testified as to who made this fundamental change in the plan agreed to by the directors of both institutions. The men who undertook to change the plan were Mr. Gates, the president of the Globe Bank, Mr. Boot, the cashier of the Globe Bank, Mr. Staley, one of its directors, and Mr. Armstrong, the national bank examiner. Apparently it was not thought necessary to consult any one representing the Home Bank as to this change in their mutual agreement, for Mr. Gates testified:

"There was a discussion at the old quarters of the Home Savings & Merchants' Bank, and there was a conference which I referred to between Mr. Armstrong and Mr. Staley and Mr. Boot and myself when we decided to go ahead as a national bank because we would have to do practically the same things, in fact, the same things; eliminate the questionable paper in the trust company, as we would in a national bank, and in that discussion it was thought best to go ahead as a national bank for the reason that we could retain some of our various bank accounts which otherwise we could not retain. The discussion I am now talking about is the discussion which occurred on Sunday afternoon. The four were present."

Mr. Boot, the cashier of the Globe Bank, was equally naive. He testified:

"On Saturday, July 4th, the Globe National Bank was moving some of their property up to the quarters of the Home Bank.

I don't recall the day, whether it was Saturday or Sunday. I know I was there both days I imagine. I was there both Saturday and Sunday, getting both institutions together. The Globe National Bank was moving up. I guess the Globe Trust Company had not been thoroughly organized. I think the arrangement was to move up there and combine the assets, to open up on Monday as the Globe Trust Company. I didn't know exactly what they were doing. I know the plan was changed Sunday afternoon. They decided to make the change to the Globe National Bank at office of the Globe National Bank with Mr. Gates, Mr. Staley, Mr. Armstrong and myself present. Up to that time we were moving in and fixing the quarters and posting the books, and preparing to open the bank Monday morning as the Globe Trust Company. I think at that time they had filed articles and made application for a charter for the Globe Trust Company."

Mr. Gates testified, in explanation of this somewhat unusual method of modifying contracts, that this was the only change in the agreement they undertook to make. He said: "We would have to do| practically the same things, in fact the same things; eliminate the questionable paper in the trust company, as we would in a national bank;" and,

"Q. Mr. Gates, I want you to give to the court your understanding of the entire agreement under which those notes, aggregating $186,000, were received into the Globe National Bank at the time they were received by the bank. A. Well, these notes, $186,000, were a part of the various items that were necessary to eliminate all paper which had been questioned by Mr. Armstrong. Then there was a further understanding when these notes were paid that the stockholders or stockholders and directors of the Home Savings & Merchants Bank were to receive a certain amount of this questionable paper in consideration of having put in the $186,000. I can't give you the exact items, the other items, that went in to make up the approximately $700,000.00 worth of questionable paper."

And again:

"Well, that is approximately as I have stated. The understanding was with Mr. Armstrong in connection, first, with the Globe Trust Company, and later, on July 5th, when we decided to go ahead as a national bank, the same amount of paper was to be taken out and in approximately the same way.

"Q. Let me see if I get you, Mr. Gates. As I see it then your evidence is that it was understood that the Globe Bank would take over the Home Bank, take its assets and assume its liabilities; that these notes aggregating $186,000.00 signed by these various stockholders were to come into the Globe National Bank; that certain criticized assets by Mr. Armstrong were to come out of the Globe Bank and go to these men who had signed these notes? A. When they paid the notes, yes. That was the agreement in connection with the Globe Trust Company. The matter had not been discussed further, as I recall, to any extent when we decided to go ahead as a national bank, but we all understood that the questionable paper would have to come out in either event, and that when these notes were paid, the $186,000.00, the men who gave the notes or the cash, as| the case might be, would benefit by the questionable paper which would be delivered to them, at that time."

When Mr. Schwalb, the custodian of these notes, was advised of this change, he was in a quandary. On Monday morning, the Globe Bank was in possession of all of the assets of the Home; was in its banking house; the Home had ceased doing business; and the Globe Bank was receiving its deposits and paying its checks. Mr. Armstrong was there to see that the $186,000 was turned over to' the Globe. He said he expected money. Mr. Schwalb was sent for, and finally concluded there was nothing else to do but turn over the notes, which he did without consulting the makers. Mr. Armstrong and Mr. Gates testified that when the notes were delivered, nothing was said. Mr. Schwalb and Mr. Cannon testified that a good deal was said, including a restatement of the conditions under which the notes were given. It is a little unusual to consummate such a transaction without any words whatever, as Gates and Armstrong testify, particularly since Armstrong must have been greatly surprised, according to his evidence, to receive notes instead of cash. However, the trial court found nothing was said, and we are bound by that conclusion. It is not at all material, however, whether the conditions were restated; Mr. Gates and Mr. Armstrong knew the terms of the agreement under which the notes were given, as Mr. Gates testified, and a restatement of them was unnecessary.

As the note makers found out, one by one, that the Globe Bank, and not the trust company, had their notes, and discovered that the Globe Bank still retained the $700,000 of criticized paper, and that there would be no 172 shares of stock of the trust company for them, they employed counsel. He and counsel

for the bank then started to try to work the thing out. The Globe Bank found itself in possession of $186,000 of paper, which it was carrying in its assets; it also had all of the assets of the Home Bank, including the $700,000 of criticized paper. A fundamental change in the agreement had been made without consent of the note makers. A ratification was, to say the least, most desirable. So counsel for the note makers and counsel for the bank started to work. The Globe Bank, now having possession of both the notes for $186,000 and the $700,000 of criticized paper, commenced demanding other concessions. First, it could not deliver 172 shares of trust company stock, as agreed, and declined to deliver Globe Bank stock in lieu thereof, or anything else. Then, it is said, Mr. Armstrong would not permit it to give up the $700,000 of criticized paper. We quote from the uncontradicted evidence of Mr. Denious as to these negotiations:

"Mr. Wright and I and Mr. Moore in that same conversation discussed the form of contract which we would make and I think it was agreed or I think it was requested by Mr. Wright at the time that we should draw up a form of contract. We had subsequent negotiations and conversations in which Mr. Wright and Mr. Gates were both present, and they reported back to me that they could not deliver any of the stock of the Globe National Bank; that that feature of the contract would have to be eliminated. They could not carry it out, but that the other provisions of the contract would be, and I went back to my people and explained the situation to them, and after we had had another conference and it was agreed Mr. Wright and I both consented, and so did Mr. Gates, that we would eliminate this stock proposition, the 172 shares of stock, and then they brought up this modification of the securities of $700,-000.00. They said Mr. Armstrong objected to that feature of it, and that it would have to be this way: that they would turn over immediately the $200,000.00 in securities, but that the $700,000.00 would have to remain there until certain items were collected."

These negotiations bore their fruit in an agreement, a part of which was the execution of a written contract, signed by the two banks, and approved by a resolution of the officers and directors of the Home; and the resolution was in turn indorsed "Approved," followed by the signature of all of the appellants. The written contract is between the Globe and Home Banks, and, omitting formal parts, provides:

"Whereas, In the opinion of Colorado State Bank Commissioner, the capital, surplus and assets of Home Savings and Merchants Bank have become badly depleted so that said Home Bank can not with safety and within the provisions of the law continue in the banking business; and

"Whereas, Overtures were made to the Globe National Bank to take over the assets and deposits of Home Bank and to assume and agree to pay its outstanding obligations; and

"Whereas, as a condition precedent thereto, the Globe Bank required that cash, or its equivalent, in the sum of One Hundred Eighty-six Thousand Dollars ($186,000) be first provided or contributed by the Directors and Stockholders of the Home Bank, to the assets of said Home Bank as a part replenishment of the depleted assets of said Home Bank; and

"Whereas, Certain Directors and Stockholders of Home Bank have complied with said condition and have advanced and contributed for the account of Home Bank the said sum of $186,000;

"Now Therefore, In consideration of Ten Dollars ($10) each to the other in hand paid and other good and valuable consideration, receipt whereof is hereby acknowledged, it is mutually agreed by and between the Home Bank and the Globe Bank, as follows:

"1. Home Bank has assigned and transferred, and does by these presents assign and transfer, to Globe Bank its entire assets of every kind and character existing as of date July 4, 1925, except those certain choses in action listed and appearing on Exhibit A hereto attached, which said choses in action are retained and reserved as the property of the Home Bank.

"2. The Globe Bank accepts said assignments and delivery of the assets of said Home Bank as of date, July 4, 1925, and hereby assumes and agrees to pay all outstanding obligations of every kind and character of Home Bank existing as of said date July 4, 1925.

"3. Of the notes, collateral and choses in action hereby assigned to Globe Bank by Home Bank, it is mutually agreed and understood that as to the following items Globe Bank is to retain and hold the same until the amounts designated shall have been paid thereon, and in each instance when such amount so designated has been paid that thereupon the remainder of the notes, collateral and securities representing said item shall be reassigned and delivered to the Home Bank, to-wit:"

Then follows a list of eleven items, with a provision as to each that it should be delivered to the Home Bank when a specified sum was paid thereon. The face value of the securities is not given, but the aggregate amount of the sums to be received by the Globe Bank before delivery was required, is $187,340.40.

The contract concludes:

"The Globe Bank agrees to appoint a Committee composed of Jno. Q. Adams, H. Brown Cannon and Thos. S. Cox and Geo. H. Knifton, to act in that respect, and agrees that it will not foreclose, sell or otherwise dispose of the collateral held as security for any of the above mentioned items without consulting said Committee, and will not foreclose or dispose of said collateral at public or private sale or by compromise, for less than the face value of the same without one hundred twenty (120) days previous written notice of its intention so to do, given to the Board of Directors of the Home Bank or the Liquidating Committee of Trustees that may be appointed by it."

Exhibit A is a list of securities of a total face value of $199,230.22.

This contract was executed on July 15, 1925. Shortly and repeatedly thereafter representatives of the Home Bank and the note makers demanded the securities listed in Exhibit A, but without success. They were finally /told that several days before the Globe Bank had signed the contract, acknowledging the right of the Home Bank to these securities, the Globe Bank had in fact appropriated them as collateral to a so-called "trustee's note" for $76,000 which the Globe Bank claimed was an additional item of indebtedness of the Home Bank not theretofore disclosed. The Globe Bank thereafter paid no attention to the rights of the note makers of the Home Bank under the contract, gave no notice as required by the last paragraph of the contract, and later challenged its validity.

The result is that the Globe Bank and its receiver has retained the $186,000 of notes, retained all of the securities listed in Exhibit A, has never accounted for the collections on the securities listed in the body of the contract, or in /fact paid any attention to its agreement. Having secured the ratification of the note makers to the delivery of the notes to it, the Globe Bank was content. As late as the trial of this case, the receiver still asserted his ownership of all the securities listed in the contract. Some collections thereon were made and retained by the Globe Bank; as to the balance, the receiver testified:

"All of the securities mentioned and itemized in defendant's Exhibit 3, in the contract between the Home Bank and the Globe Bank and dated July 4, 1925, are the securities and notes which I have just detailed as being held as security for this trustee note. All of these securities and collateral which have not been collected still remain in my possession as security for that note."

On this state of facts, the trial court held as a matter of law that there was no defense to the notes. The facts not being in dispute, his decision as to the legal result flowing therefrom is subject to review.

The trial court found that the $186,000 notes were executed to effect a consolidation of the Home and Globe Banks, and to secure the consent of the Comptroller of the Currency thereto; that the delivery of the notes to the Globe Bank was unconditional; that the notes became a part of the assets of the Globe Bank; and that such bank held itself out to the public as owner, the note makers knew such facts, and ratified their delivery and acquiesced in such ownership. As a conclusion of law, he found that the Globe Bank was a holder of such notes in good faith and for value, and that there was no failure of consideration therefor. No reference is made in the findings to the written contract, except a finding that, when the notes here in suit should be paid, the note makers were to have criticized paper in the face amount of $900,000.

In a memorandum opinion, the court states that the written contract of July 15 does not deal with the notes or the rights of the makers; that such agreement imposes no liability on the Globe Bank in favor of the note makers, nor does it affect the negotiability of the notes; that, if the note makers have any rights in the $900,000 of criticized paper, that is a matter between them and the Home Bank; furthermore that, by their conduct and acquiescence, the note makers have permitted equities to be created in favor of depositors of the combined institutions; that the note makers put up these notes in compliance with the mandate of the Comptroller; that they thus brought about the consolidation, which cannot be affected by a subsequently executed contract.

The trial court's position is substantially that of the receiver, who asserts that the Globe Bank simply acquired the assets of the Home for value; that among these assets were these notes; if the note makers have any complaint, they must look to the Home Bank.

Even upon the theory of the receiver and the trial court, we are unable to see how the conclusion arrived at could be reached un-

der the undisputed facts. True, the notes were negotiable, and, assuming that the Globe Bank acquired them for value, the fact still remains that the officers and directors of the Globe Bank knew that they were given in pursuance of an agreement by which the makers were to receive $700,000 of criticized paper for them. The president of the Globe Bank, its attorney, its cashier, a majority of its directors, and the national bank examiner knew every term of the agreement under which these notes were made. They participated in making it. Several of them were on the stand, and none denied it. This is of course knowledge of the bank. Curtis v. Connly, 257 U. S. 260, 42 S. Ct. 100, 66 L. Ed. 222. Even a purchaser for value cannot take negotiable paper freed from conditions attached which he knows all about. The receiver argues that the Globe Bank acquired these notes from the Home Bank. The facts, and the findings of fact, are to the contrary. The Globe Bank got these notes after they were in full possession of all the assets of the Home, and got them directly from Mr. Schwalb, a custodian for the makers. But, even if the Globe acquired them from the Home, which it did not, still it had full knowledge of the conditions attached to them, and, having such knowledge, its purchase would not have freed them from such conditions. If the transaction had ended on the morning of July 6th, as the receiver contends, we are unable to see how any suit could be maintained on these notes. The Globe Bank took them knowing they were made to be delivered to a trust company in return for 172 shares of stock and $700,000 of paper. When the Globe took these notes, it knew it had the $700,000 of paper, knew the 172 shares of stock were not in existence, and knew the makers did not intend a delivery to the Globe Bank. It is not at all clear to us how the Globe Bank could expect to collect on these notes and keep the $700,000 of paper too. There is no suggestion here that the national bank examiner or his department were misled, as appears from some of the cases cited by the receiver. On the contrary, the bank examiner was an active participant in the whole transaction. He knew all about it, and the receiver, in his brief says:

"No question of fraud enters into this case. Appellee does not contend that any of the parties intended at the time the notes were given, to defraud either the Globe Bank or the Comptroller, and there is no question but that the evidence of all of the defendants and, in fact, all of the evidence in the cases, shows that at the time the defendants gave their notes they intended them to represent cash according to their tenor."

But it is not necessary to decide the question of the rights of the parties if the transaction had concluded on the morning of July 6th. The transaction was not then in fact concluded.

The note makers contend that the agreement of July 15th, between the note makers and the Globe Bank, including as a part thereof the written agreement of that date between the two banks, measures the rights of the parties. The receiver contends, and the trial court has found, that such a subsequent agreement has nothing to do with the case. When that question is decided, the case will be decided, for there is no contention that the Globe Bank made any pretense of complying with its agreements in that contract. On the contrary, it converted to its own use the paper described in that contract by attaching it as collateral to another note, refused to turn any securities over, at an early date expressly repudiated its obligations, and on the trial of this case asserted ownership in the paper described in the written contract.

 What was the controversy settled by the July 15 contract? Who were the parties to it? There is no dispute in the evidence on the point. Mr. Denious, counsel for the note makers, testified fully as to the negotiations leading up to it; the note makers offered the deposition of Mr. Wright, counsel for the other side, the Globe Bank, in these negotiations, as corroborative of Mr. Denious, but it was ruled out on objection of the receiver. Mr. Denious testified to conversations and transactions with Mr. Gates, Mr. Wright, and other officers of the Globe Bank. Mr. Gates and other officers were on the stand, Mr. Wright in the court room, and yet no one disputed the testimony of Mr. Denious. His evidence must therefore be accepted.

What was this controversy? Mr. Denious tells of the very first conference he had with the attorney and officers of the Globe Bank:

"The next day or within the next two or three days I had a conference with Mr. William D. Wright, Jr., attorney for the Globe National Bank, and with Mr. Herman Gates, the President, at which Mr. Moore was also present. I told Mr. Gates and Mr. Wright that Mr. Schwalb had reported to me what had happened at the bank on Sunday evening and on Monday morning, and I stated that Mr. Schwalb had reported to me that he had taken the responsibility of delivering these notes aggregating $186,000.00 to Mr. Gates as President of the Globe National Bank on Monday morning, although they had been de-

livered to him by these people, by the makers, for the express purpose of being delivered to the Globe Trust Company, and I recited the conditions under which Mr. Schwalb had reported to me that he delivered these notes, these conditions being that all of the assets of the Home Savings & Merchants Bank were to be transferred to the Globe National Bank in consideration of the Globe National Bank assuming and agreeing to pay all of the debts and liabilities of the Home Savings & Merchants Bank, and that the criticized securities, aggregating approximately $700,000.00, were to be turned over to these people who made these notes of $186,000.00 and that they were also to receive 172 shares of stock of the Globe Trust Company, and that these notes Mr. Schwalb had reported had been turned over to him on those same conditions, and Mr. Gates said that was correct. He said, however, he didn't see how they could carry out that part of the agreement with reference to the stock of 172 shares, because this changed the transaction. I told him that they could easily do that by having the stockholders of the Globe contribute proportionately that 172 shares. I explained to him that several of these makers of these notes had come to me since I had returned to Denver, and had bitterly criticized Mr. Schwalb for turning over their notes to the Globe National Bank contrary to the instructions which had been given him, and that they would not consent to any change in the proposition."

This was the controversy that the agreement of July 15 settled, the delivery of these notes to the bank instead of the trust company, and the conditions attached to the delivery. He then tells how the Globe Bank representatives reported that they could not deliver 172 shares of bank stock in lieu of trust company stock—that they said "that feature of the contract would have to be eliminated; that they could not carry it out, but that other provisions of the contract would be." What were they negotiating about? What contract were they endeavoring to modify? In what contract did 172 shares of stock figure? It was the contract, upon the terms of which the $186,000 of notes were delivered; and nothing else can be made of it.

Mr. Denious said he went back to "my people" and secured their permission to eliminate the provision as to 172 shares of stock. He testifies that the representatives of the Globe Bank then "brought up this modification of the securities of $700,000." In what contract did the figure of "$700,000" of securities come in? In the oral contract for the delivery of the $186,000 of notes. There

is no need to pursue it further; the items of "$186,000 of notes," of "172 shares of stock," of "$700,000 of securities," were pivotal figures in the agreement of July 2d; the same items are the outstanding points in the negotiations leading up to the July 15th agreement. This cannot be charged to coincidence; and the fact must go as proven and undisputed that the negotiations after July 6th were efforts to modify and settle the agreement of July 2d, under the terms of which these $186,000 of notes were turned over. The agreement, so settled, was "agreed upon by Mr. Wright and Mr. Gates for the Globe Bank, and myself [Denious] acting for the Home Bank crowd," which are the appellants herein. Mr. Denious closed his testimony as follows:

"When Mr. Wright and Mr. Gates and I were considering the preparation of this document now marked Exhibit 3 we called meetings of the signers of the notes and submitted to the signers who were present at those meetings questions of modification of the contract. We had meetings in my office I think of all the signers of the notes with the possible exception of Mr. Weicker. I know he was out of town for a part of the time. The signers of these notes in my office in these conferences agreed that the original condition of the delivery of the notes might be modified by modifying the conditions, and agreed to the contract as I finally prepared it."

The correctness of this conclusion may be tested by turning the matter around. Supposing, after the execution of the July 15th contract, the note makers had brought a replevin action for the $700,000 of securities contemplated by the agreement of July 2d. The Globe Bank would have produced the July 15th contract and said: "But we changed that agreement by this writing; instead of $700,000 of paper to be delivered to them immediately, the note makers agreed in writing that we should presently turn over $200,000 to a third party, the Home Bank, and turn over $700,000 more at a later date when we have made some collections in it." Such defense must necessarily prevail. Moreover, in this particular case, when some of the note makers claimed that the delivery to the Bank instead of the Trust Company was wrongful and afforded a defense, the receiver answers the contention, in his brief filed in this court, by stating:

"In the second place, appellee Bourk, by participating in the action taken by himself and his co-directors in the Home Bank on July 15, definitely confirmed the delivery of his note in consonance with the provision of

the Home-Globe Contract (Defendants' Exhibit 3)."

■ If the contract binds the note makers when it suits the convenience of the receiver, it should bind when it does not. Another proof of the proposition under consideration is this: The July 2d agreement concerned itself with some $700,000 of securities criticized by the bank examiner in his report of May 16. That report listed the criticized securities. The July 15th contract lists many of the identical items. The July 2d verbal agreement formed the basis of the negotiations after July 6th. The July 15th agreement between the parties and the written contract between the banks executed in pursuance to that agreement merged all these prior agreements, and, under rules of law so well settled as to make any citations of authority superfluous, measured the rights of all parties—the Globe Bank, the note makers, and the Home Bank. We must look to it, and it alone, to ascertain the rights of the parties.

By the agreement of that date, the note makers ratified the delivery of their notes to the bank instead of the trust company; they waived any claim to 172 shares of stock in the trust company, or any payment in lieu thereof; they relinquished their right to the immediate delivery to them of $700,000 of criticized paper, then in the possession of the Globe Bank. In turn, the Globe Bank agreed that paper of the face value of $199,230.22 should be retained and reserved by the Home Bank. Since the Globe Bank admittedly had possession of this paper, there was an implied agreement of immediate delivery to the Home Bank. The Globe further agreed, after certain collections were made thereon, to turn over to the Home Bank certain other securities; as to these securities, it further agreed not to foreclose, compromise, or sell them without consulting certain named parties, and adequate notice.

This was the agreement. The Globe Bank violated it almost immediately by refusing to turn the $199,230.22 of paper over on demand. It has neither accounted, nor offered to account, for the other securities. It has not consulted the parties named as to its handling. It has, in another action, denied the validity of this agreement, and now makes no pretense or justification for violating it, but contents itself with disclaiming its bearing on the controversy.

■ It is a fundamental rule of contract law that one party, itself in substantial default, may not hold the other party to his contract, at common law. National Surety Co. v. Long, 125 F. 887 (8 C. C. A.); Kansas Union Life Ins. Co. v. Burman, 141 F. 835 (8 C. C. A.); Omaha Water Co. v. Omaha, 156 F. 922 (8 C. C. A.); Kempner v. Goddard Grocer Co., 5 F.(2d) 807 (8 C. C. A.). Section 28, art. 2, of the Negotiable Instrument Law (C. L. Colo. § 3845), provides that failure of consideration is a defense, and partial failure is a defense pro tanto. That the consideration may pass to a third party (the Home Bank), see section 75(2), Restatement of the Law of Contracts, which states the law to be that "Consideration may be given to the promisor or to some other person. It may be given by the promisee or by some other person." Section 84, Restatement of the Law of Contracts, states that "Consideration is not insufficient because of the fact that obtaining it was not the motive or a material cause inducing the promisor to make the promise." The legal situation may be simply illustrated. A father gives an automobile agency a note to pay for a car to be delivered to his son, and a sales contract between the agency and the son is signed up. The agency declines to deliver the car, and yet sues the father on the note. When the father objects to payment before delivery, the agency replies that it is no concern of the father's whether it ever delivers the car to the son. Manifestly it is the father's business, and his defense is good. Nor could a second dealer buy the agency and the note, knowing of the conditions, and decline to deliver the car and still collect on the note.

■ Further reference to the authorities is unnecessary. The parties do not disagree as to these fundamental rules. The disagreement is largely over the questions discussed at length herein. We hold that, induced by motives of their own, the note makers ratified the delivery of these notes to the Globe Bank, in consideration of its agreement (1) to deliver to the Home Bank on demand, the securities listed in Exhibit A; (2) to deliver to the same bank the securities listed in the body of the contract, after certain collections thereon were made; (3) to consult and notify certain named parties as to the handling of such securities; (4) to pay all the indebtedness of the Home Bank. It did none of them, and it cannot decline to do everything it agreed to do and still recover on the notes. It cannot appropriate securities to its own use, and then sue on the notes given for them.

The principal controversy between the parties is whether the agreement of July 15th must be taken into account, but one or two other contentions of appellee may be shortly disposed of. The appellee argues that, if a director puts an accommodation note into a bank, either to keep it open, or to bring about

a merger, he is estopped to set up absence or failure of consideration. Some cases are cited which so hold. We need not explore that question. The notes here were put up in consideration of certain things being done by the Globe Bank; those things were not done, and the cases cited are without application.

It is further argued that these notes were put up in order to get the Home Bank off their hands, and to get the permission of the Comptroller. That is true, but the fact still remains that they did not put them up unconditionally; they put them up upon an agreement involving certain securities coming to them, or to their bank, and they did not get what they bargained for. It is suggested that the agreement by which the directors secured a lien on this criticized paper for the amounts advanced by them is a fraud on the Home Bank. Probably the receiver is not in position to raise this question, since the stockholders of the Home Bank approved the arrangement. However, we can see no objectionable feature involved, and this particular contract has been adjudged valid. Bishop v. U. S., 16 F.(2d) 410 (8 C. C. A.).

This disposes of the suits on the notes in question. Deposits that are set off have been adjudicated, but must share with the general creditors, except that the deposits of Weicker, and his claim against the receiver on account of the payment of his note, may be set off against the notes, which he does not dispute. In the cases where the notes have been paid, or partially so, the note makers have asked, in their prayers, that their judgment be declared to be a first lien against the assets in the hands of the receiver. There is nothing in the record or briefs concerning this claim of priority. The note makers who have paid their notes have alleged a breach of the agreement by the Globe Bank, a wrongful conversion of part of the securities, and damages on account thereof. They pray for a money judgment. The note makers have elected, by these actions and defenses, to treat the contract as breached, and have either sued for their damages or defended on the notes; an election which they had a right to make. Central Trust Co. of Illinois v. Chicago Auditorium Ass'n, 240 U. S. 581, 36 S. Ct. 412, 60 L. Ed. 811, L. R. A. 1917B, 580; Roehm v. Horst, 178 U. S. 1, 20 S. Ct. 780, 44 L. Ed. 953; In re Eliza Lines, 199 U. S. 119, 26 S. Ct. 8, 50 L. Ed. 115, 4 Ann. Cas. 406. Having so elected, they have abandoned any claim to the criticized paper, and no reason is suggested or apparent why they should have a lien on the general assets, or any preference over depositors. If it is suggested that this results in a discrimination against one who has paid his note, it may be suggested that on every bank failure, the one whom the bank owes is the loser, and not the one who owes the bank. It is unnecessary to consider assignments of error relating to the exclusion of evidence.

The causes will be reversed for proceedings in harmony with this opinion.