**UNITED STATES of America,**
**Plaintiff,**

v.

**LENNOX METAL MANUFACTURING COMPANY, Inc., and Frank Margiotta and Herbert B. Pearl, as Co-Trustees of the Lennox Metal Manufacturing Company, Inc., Defendants.**

**Civ. A. No. 13186.**

United States District Court
E. D. New York.

Feb. 2, 1954.

On Motion to Set Aside Oct. 5, 1954.

Leonard P. Moore, U. S. Atty., Eastern Dist. of New York, Brooklyn, N. Y., Lewis S. Flagg, III, Asst. U. S. Atty., Brooklyn, N. Y., of counsel, for plaintiff.

Timen & Waters and Kadel & Wilson, New York City, special attorneys for

Trustees in Reorganization, and Nathan Korn, Brooklyn, N. Y., and Edwin M. Slote, co-attorneys for co-trustees; Lawrence S. Timen, New York City, of counsel.

ABRUZZO, District Judge.

This action was instituted by the United States of America against the Lennox Metal Manufacturing Company, Inc., a contractor, and its trustees appointed pursuant to Chapter 10 of the Bankruptcy Act, § 101 et seq. thereof, 11 U.S.C.A. § 501 et seq.

The trustees are mere nominal defendants, and all subsequent references hereinafter shall relate solely to the Lennox Metal Manufacturing Company, as defendant, and to the United States of America, as plaintiff.

The Government seeks to recover from the defendant certain materials, machinery, and equipment, and to recoup the sum of $149,118.38 partial payments advanced by it to the defendant under a written agreement and various supplemental agreements and change orders A to J.

The defendant denies the Government's right to any equipment or recoupment, sets up several defenses, and asks for a money judgment against the plaintiff. More will be said later in this opinion with respect to the plaintiff's claims and defendant's answer and counterclaims.

In order to understand clearly what I term the crux of this case, it will be necessary to comprehensively set forth a complete historical background of the defendant and, in addition thereto, a comprehensive statement of facts from the date of the agreement between the parties to the date of cancellation of this agreement by the plaintiff.

The defendant was created in 1944. In 1946 the defendant was incorporated. For some time its work was primarily that of a sheet metal subcontractor for prime contractors who were doing Ordnance work, Signal Corp work, and other departmental work for the Government. Herbert B. Pearl, its president and one of the trustees in the reorganization proceeding, has been continuously connected with the defendant since its inception in 1944. He has been in the sheet metal business for more than 22 years, has a thorough knowledge of this type of business, and has studied mechanical engineering.

On April 25, 1951, Lennox procured a letter contract from the Department of the Army, New York Ordnance District. This agreement was terminated by the Government on October 31, 1952, but in that period of time many things happened and much water flowed under the bridge. Pursuant to this contract the defendant was to make a .50-caliber ammunition box made of metal. At the time the defendant procured this contract it was a going concern and thoroughly solvent, having an approximate net worth of $90,000. Thereafter arrangements were made by the defendant with Mastan Company, Inc., a private banking organization, for the granting of $250,000 credit for the purpose of financing this contract. During the period of time the contract was in being, Lennox procured approximately $230,000 of this loan from Mastan, and gave three chattel mortgages covering its fixtures, machinery, and equipment, and an assignment of the moneys that were to become due to the defendant under this contract. The record shows beyond dispute that the money so procured from Mastan was spent entirely in the performance of this contract.

While the contract was in existence, defendant continued with its civilian business which it operated at a profit, devoted its profit from its civilian business to the Government contract, and its capital of $90,000 was also devoted to the contract. Before the defendant entered into this contract of April, 1951, with the plaintiff, Pearl attended a meeting at the Frankford Arsenal in Philadelphia for the purpose of negotiating for the contract. There he saw a non-dimensional or non-scale drawing applicable to a .50-caliber box. He estimated the price to be paid by the plaintiff for these boxes on the basis of this drawing. The letter

contract was thereafter entered into (Exhibit 1).

In order to understand the problem the defendant was confronted with in making what looks to me to be a very simple metal box, an explanation must be made of each step that took place, to wit:

On June 14, 1951, a more formal agreement designated supplemental agreement No. 1 (Exhibit 2) was entered into. It provided for a unit price of $1.449 and a total price of $1,285,987.50. It contained a delivery schedule providing for specified monthly deliveries, first delivery to be made on or before July 31, 1951, and a final delivery on or before February 29, 1952. This took in a period of about 10 months.

Paragraph 2 of the General Provisions provides in part that the contracting officer may at any time by a written order make changes within the general scope of the contract in (1) the drawings, designs, or specifications, (2) method of shipment or packing; and (3) place of delivery. It also provided:

"If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. * * *"

Paragraph 11(f) of the General Provisions provides in part for the payment of liquidated damages for each calendar day of delay, and also provides that the contractor shall not be charged with liquidated damages when the delay arises out of causes beyond the control and without the fault and negligence of the contractor as defined in Paragraph 11(b). This Paragraph 11(b) of the General Provisions also provides that the contractor shall not be liable for any excess costs if any failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the contractor. Such causes included acts of the Government and strikes.

Change Order "A" (Exhibit 6) was issued on August 15, 1951, changing the width of the handle link and directing a change in the type of carton used in packaging the ammunition box.

Prior to the execution of Supplemental Agreement No. 2 on January 31, 1952, the defendant wrote to Ordnance calling its attention to a discrepancy on a certain drawing with regard to mash welding and to the impossibility of performance of the mash welding of the end seams, recommending changes in drawings and specifications to correct the discrepancy. It wrote several other letters to Ordnance regarding other variations and requesting permission to deviate. It later wrote to the Small Arms Ammunition Section at the Frankford Arsenal, informing it that defendant had not received notice of acceptance of its recommendations and would be unable to furnish a production box that fully complied with the drawings and specifications until it received written acceptance of the deviations recommended by it. On August 29, 1951, and on September 28, 1951, Change Orders "B" and "C" (Exhibits 7 and 8) were issued which changed the method of mash welding and changed the dimensions of the box in conformity with defendant's recommendation. It took from June 1, 1951, to September 28, 1951, to effect these changes. The fabrication of the box pursuant to the contract and these changes required retooling of defendant's equipment, both as to blanking and forming dies, as well as the creation of welding jigs and fixtures for spot welding and seam welding. It also included the fabrication of a good deal of specialized testing equipment to test the accuracy of the parts insofar as the prevailing drawings were concerned. Defendant in its plant built and in some cases had built by outside contractors tools, dies, jigs, and fixtures. The defendant in its plant also built specialized welding equipment and specialized testing equipment, and facilities for painting, baking, and packaging of the boxes. Prior to the contract it had baking and painting

equipment, but it had to develop special means of controlling the ammunition boxes after painting and before they could be baked. This necessitated a delay and expense not contemplated or foreseen by the defendant.

Defendant, after it received the letter contract, ordered steel as specified in the drawings, but was unable to fabricate the boxes because the steel was unworkable and unsuited to several parts of the boxes that required drawing or deformation of the metal without breakage. In September, 1951, a meeting was held at the Frankford Arsenal at which were present defendant's representatives, representatives of two other companies who had been awarded contracts for the .50-caliber ammunition boxes, representatives of steel mills supplying the various contractors, representatives of the Ordnance Districts involved in administering the contracts of the three contractors fabricating the boxes, and representatives of the Arsenal. The conference had been called to determine the validity of the claims by the contractors that the materials as specified in the specifications were unworkable and unsuitable. The conference resulted in a change in the Rockwell hardness scale and the chemistry of the carbon content of the steel.

After this meeting, the Government rewrote the specifications for the steel content, and on November 23, 1951, issued Change Order "D" (Exhibit 9) changing the carbon content of the steel.

On December 28, 1951, Change Order "E" was issued providing for a slight indentation on the bottom of 25,000 boxes. With these various changes it can readily be seen that it was impossible for defendant to comply with the delivery schedule set forth in Supplemental Agreement No. 1.

On January 31, 1952, a supplemental agreement designated as Supplemental Agreement No. 2 (Exhibit 3) was executed, changing the delivery schedule. Up to this time defendant had not been able to deliver a single ammunition box.

Whereas Supplemental Agreement No. 1 provided for a final delivery of the ammunition boxes on or before February 29, 1952, under the provisions of Supplemental Agreement No. 2, the date of February 29, 1952, became the date of the first delivery of the boxes. This agreement contained the following:

> "Whereas, it has been administratively determined that the Contractor was excusably delayed from 1 September 1951, by reason of unforeseeable delays in delivery of materiel and by reason of acts of the Government,

> \* \* \* \* \* \*

> "2. It is determined that the Contractor was excusably delayed in the performance of the contract from 1 September 1951."

In December, 1951, Pearl, defendant's president, spoke to Lt. Col. Blois, the contracting officer, and Mr. Statler, negotiator for Ordnance Purchase Branch. He had previously written them requesting some type of interim payment which would enable defendant to recoup some of its extra expenditures and, because of these written requests, he was invited by Col. Blois to a discussion. Col. Blois authorized Mr. Statler to negotiate for a partial payment clause to be included in the contract. Pearl met with Statler several times and in January, 1952, he prepared an analysis of his incurred costs to that date and gave it to Statler. On February 19, 1952, he prepared an invoice, No. Z650, showing the costs incurred by defendant up to that time, totaling $437,285.39, and requested a partial payment. Statler told Pearl that defendant could receive a partial payment of 75% or $327,964.04, but that he, Statler, could not go ahead with the completion of the partial payment arrangement because it constituted a change in the contract and there was no consideration for making the change. After some calculations Statler arrived at a consideration which was exactly 1% of the 75% of the incurred costs, and this consideration was agreed to by Pearl.

On February 28, 1952, Statler wrote to the Awards and Settlements Board recommending that the contract be changed by the insertion of a 75% standard partial payment clause and providing for a decrease of $3,279.64 in the contract amount, to be deducted from any invoice or vouchers submitted by defendant. A memorandum from the Fiscal Officer dated February 21, 1952, advising that defendant was financially able to perform under the contract as amended by the proposed partial payment agreement was forwarded with Statler's recommendation.

On March 3, 1952, Supplemental Agreement No. 3 providing for partial payments to defendant was executed. It provided in part as follows:

"(a) The Contracting Officer may, from time to time, authorize partial payments to the Contractor upon property acquired or produced by it for the performance of this contract: *Provided,* that such partial payments shall not exceed 75 per cent of the cost to the Contractor of the property upon which payment is made, which cost shall be determined from evidence submitted by the Contractor and which must be such as is satisfactory to the Contracting Officer: *Provided further,* that in no event shall the total of unliquidated partial payments (see (c) below) and of unliquidated advance payments if any, made under this contract, exceed 80 per cent of the total contract price of supplies still to be delivered.

"(b) Upon the making of any partial payment under this contract, title to all parts, materials, inventories, work in process and non-durable tools theretofore acquired or produced by the Contractor for the performance of this contract, and properly chargeable thereto under sound accounting practice, shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by the Contractor for the performance of

this contract and properly chargeable thereto as aforesaid shall vest in the Government forthwith upon said acquisition or production: *Provided,* that nothing herein shall deprive the Contractor of any further partial or final payments due or to become due hereunder; or relieve the Contractor or the Government of any of their respective rights or obligations under this contract.

"(c) In making payment for the supplies furnished hereunder, there shall be deducted from the contract price therefor a proportionate amount of the partial payments theretofore made to the Contractor, under the authority herein contained."

Immediately after signing the supplemental agreement, Pearl requested payment of $327,964.04, but payment was refused. He spoke to Statler who referred him to Captain LeBeau, Chief of the Fiscal Office. LeBeau told Pearl that Colonel Blois had instructed him not to pay the full amount and that he was authorized to pay only a part of it. Pearl spoke to Colonel Blois and was advised by the Colonel that the payment was discretionary with him and that, in his opinion, it was not good business to pay the $327,964.04 at that time, and that he was doing all that he felt was necessary to be done in paying defendant approximately $150,000. The amount of $327,964.04 was accurate and not in dispute. The defendant was put to a great additional expense not contemplated when the initial agreement was entered into.

At Colonel Blois's direction, Pearl saw Captain LeBeau again and advised him that he did not know how to prepare a new invoice approximating $150,000. Captain LeBeau then marked off the first four items on the February 19th invoice totaling $208,245.21, stating that 75% of these items would amount to a little over $150,000. He advised Pearl to prepare a new invoice of these four items and he would pass it immediately for payment. Subsequently a payment of

$152,904.27 was made to Mastan Company as assignee of defendant. This payment was based on 75% of $208,-245.21 which came to $156,183.90, from which was deducted $3,279.64, the consideration for the partial payment agreement.

Two other partial payments were subsequently made; one of $56,786.08 was made on June 2, 1952, and the other of $80,244.24 was made on July 24, 1952. These were also paid to Mastan Company as assignee of defendant. The $56,-786.08 payment on the suggestion of Captain LeBeau was figured on the last four items in the February 19, 1952, invoice.

In the interim, Change Orders "F" and "G" were put into effect, but neither of these orders are of importance to the issues involved here.

The evidence indicates without dispute that after the agreement of March 3, 1952, known as Supplemental Agreement No. 3, went into effect the defendant endeavored to make some headway with production and some deliveries were made. The testimony is obscure as to how many boxes were delivered, but there was some measure of production and the defendant was endeavoring to make production in compliance with the agreement. The testimony indicates that there was no complaint on the part of the plaintiff with respect to their production between March and June 2nd.

Another halt in production was caused in June. There was a steel strike. It caused restriction in the fabrication or manufacture of the boxes. The defendant was also restricted by the Control Materiels Plan which was an attempt by the properly constituted governmental authorities to limit the amount of critical and semi-critical raw materials available to contractors. Recognizing that the steel strike interrupted the defendant's ability to produce, a Supplemental Agreement No. 4 dated July 17, 1952, was executed. It read in part as follows:

"Whereas, it has been administratively determined that the Contrac-

tor has been excusably delayed in the performance of the contract, and

\* \* \* \* \* \*

"Said schedule is subject to delay in receipt of steel as the result of the pending steel strike.

\* \* \* \* \* \*

"4. It is understood and agreed the aforesaid adjusted delivery schedule constitutes a complete adjustment of all of the Contractor's claims by reason of the facts of the Government to the date of this agreement."

The delivery schedule contained in subdivision 4 reverted to the schedule set up in Supplemental Agreement No. 2 of February, 1952.

At this time the defendant protested the withholding of partial payments and sought to convince the plaintiff that the original setup of partial payments of some $427,000 due the defendant which was cut to $150,000 greatly hampered the defendant. The record of what occurred in the several changes of the original agreement and the steel strike was cited as an example of why this partial payment should have been made as requested by the defendant. Colonel Blois apparently was more interested in the penalty clause and attempted through Mr. Kelly, Chief of the Legal Section, to find some means whereby this clause could be eliminated in whole or in part.

On July 16, 1952, the Ordnance Department issued Change Order "H" (Exhibit 13) changing the drawings and specifications of the box on the condition that said changes did not increase the cost to the Government, nor extend the time of delivery. The defendant declined to comply with Change Order "H" on the conditions stated. On August 20, 1952, the Ordnance Department issued Change Order "I" which was identical to Change Order "H" as to the changes in drawings and specifications, but these changes and modifications were not to take effect until after the defendant's then supply of 9 tons of steel was

used in the production of boxes in accordance with the old specifications. It also provided for an increase in the cost of performance if this was necessary.

Change Order "I" issued as late as August 20th required the defendant to retool completely at an approximate cost of $120,000. Old dies and test fixtures had to be scrapped in favor of new ones. New test fixtures, test devices, special jigs, special gauges, and welding equipment had to be designed and built which would permit an in-production checking of each part so that defendant could remain within the "acceptable quality level."

There is no real contradiction that this retooling under Change Order "I" would take considerable time. The defendant estimated it at 90 days and the plaintiff estimated it at less, but there is no dispute that there could be no production while this retooling process went on.

On August 31, 1952, defendant presented to Ordnance an invoice for $235,-427 (Exhibit B), costs incurred prior to the issuance of Change Order "I" and in compliance with Change Order "I". At this time Change Order "J" was made by the plaintiff but this has no bearing on the issue involved in this action.

There was some dispute as to the items in this particular invoice, but there is no real dispute that at least $120,000 of it were good costs necessary to comply with the requirements of Change Order "I".

On September 4, 1952, with respect to this Change Order "I" and production under it, Pearl had a conference with Colonel Berger, Captain LeBeau, and other representatives of Ordnance. This conference had been called by Ordnance. Colonel Berger officiated and was apprised by Pearl that after defendant completed the changes under "I" and procured funds with which to continue there would be no impediment toward completion of the contract. Colonel Berger asked Captain LeBeau if he would make partial payments and the Captain answered affirmatively. The plaintiff was apprised that the defendant, in order to accomplish the production of 40,000 boxes in September, 50,000 in October, and 60,-000 per month thereafter, intended to work additional shifts and increase its personnel.

On September 22, 1952, defendant wrote to the Ordnance Department and, among other things, advised it that defendant would be unable to resume production " * * * unless and until we do receive a partial payment * * *. Various conferences were held with Colonel Kriser and Colonel Walker, the Chief of the New York Ordnance District, but out of these conferences the conclusion can be drawn that Colonel Walker knew that this plan could not operate without some kind of a partial payment. As a result, Colonel Walker stated that Ordnance was willing to continue with the contract if he could be assured that defendant had the production facilities and would utilize moneys made available for that purpose. He advised Pearl that he would send a production team out to defendant's plant to determine if defendant had facilities suitable for completing the contract and, if they reported back favorably, he would send a fiscal team out to determine how a partial payment program could be really worked out so that defendant would get funds and the Government would get proper protection and, if both teams reported back favorably, he would proceed with the contract. He told Pearl that the contract was in full force and effect, and that defendant was to continue to meet the requirements of Change Order "I". After this conference, a production team visited defendant's plant and, after inspection, reported that they were satisfied defendant had the facilities to produce 60,000 boxes a month, if it had finances. Subsequently, a fiscal team visited the plant. After this team made its report as to a partial payment plan Captain LeBeau advised defendant that "they" had agreed upon a plan whereby 75% of costs incurred from that time on would be paid, together with some portion of the unpaid balance due. I have no doubt that "they" meant all who had authority to make this agreement, including

Colonel Walker. There is no question in my mind as to Captain LeBeau's authority to make this promise.

On September 26, 1952, defendant sent a telegram (Exhibit M) to Ordnance advising that it had already spent or obligated itself in excess of $120,000 with more costs yet to be determined, and requested payment of its $235,427 invoice. The plaintiff also knew that this was a small business as compared with other large firms, and that capital funds were a necessary part of its ability to produce.

On October 10, 1952, in spite of Captain LeBeau's promise, Colonel Walker was not ready to come to a decision as to whether the partial payment under Change Order "I" was to be made, or whether he was going to terminate the contract or continue production under it.

On October 20, 1952, Colonel Walker advised the defendant that he was going to terminate the contract and on October 31, 1952, a notice of termination was sent to defendant. In its termination notice, Ordnance set forth several reasons for its cancellation of the contract. They can be summarized as follows: (a) Defendant's failure or refusal to produce and deliver ammunition boxes in accordance with the delivery schedule; (b) defendant's failure to undertake, in a workmanlike and efficient manner, to comply with the requirements of Change Order "I"; and (c) lack of adequate financing did not constitute an excusable delay. The notice also stated that defendant's demand for an additional partial payment as set forth in Invoice No. Z3221, dated August 31, 1952, in the amount of $235,427 had been refused because neither defendant's records, nor property produced and/or acquired, could support the amount demanded, and defendant's failure to make adequate progress under the contract had endangered performance of the contract and repayment of partial payments previously made.

The plaintiff's contention apparently is to the effect that the defendant breached its contract or agreement by not complying with delivery schedules. The record does not bear out this contention in the slightest. On June 14, 1951, Supplemental Agreement No. 1 (Exhibit 2) was entered into. That contained a delivery schedule, final delivery to be made on or before February 29, 1952. Prior to the making of this agreement the plaintiff's attention was called to the impossibility of performance due to a discrepancy in the drawings with respect to the mash welding. On August 29, 1951, and again on September 28, 1951, Change Orders "B" and "C" were issued in accordance with the changes suggested by the defendant and its recommendations were adopted. Obviously the plaintiff could not expect any production during that period of time as this mash welding change required retooling to a great extent.

In September, 1951, it appeared that the steel required was unworkable for the manufacture of these boxes. After the Frankford Arsenal conference, the Rockwell hardness scale and the chemistry of the carbon content of the steel was changed and again the defendant's suggestions were adopted by the plaintiff, this necessitating a rewriting of the specifications of the steel content which resulted, on November 23, 1951, in the issuance of Change Order "D". On December 28, 1951, Change Order "E" was issued by the plaintiff.

There was very little production up to that time and it can readily be seen that all fault for lack of production must be laid at the door of the plaintiff.

On January 31, 1952, Supplemental Agreement No. 2 (Exhibit 3) was executed which changed entirely the delivery schedule. Instead of February 29, 1952, being the last date of delivery, it became the first.

In December, the question of interim payments came up. As a result of the discussion of interim payments on March 3, 1952, Supplemental Agreement No. 3 was executed. Still there was no production up to that point of any account. This Supplemental Agreement No. 3 recognized the fact that the defendant was entitled to some interim partial cash payment due to the fact that from the in-

ception of the first agreement up to March 3, 1952, production could not be obtained because of plaintiff's acts.

It must be borne in mind that up to that date the defendant meticulously carried out all orders directed to it by the plaintiff. The lack of production up to March 3, 1952, therefore, was entirely the fault of the plaintiff.

After Supplemental Agreement No. 3 was put into effect, the testimony indicates that there was some measure of production until June 2, 1952. The testimony is somewhat obscure on both sides as to how many boxes were produced, but it does appear undisputedly that some $36,862.55 was retained by the plaintiff for boxes which the defendant had delivered to the plaintiff. Another delay was caused in June by the steel strike which lasted some five or six weeks. Recognizing the inability to produce boxes because of that strike, Supplemental Agreement No. 4 dated July 17, 1952, was executed, excusing the defendant from the performance of his contract. This brought acutely in focus the question of partial payment under Supplemental Agreement No. 3 of March 3, 1952.

While the defendant's protests with respect to the failure to make partial payments as agreed upon were taking place, on August 20, 1952, the plaintiff issued Change Order "I". To retool under this change order, defendant needed 90 days. This would have carried defendant to sometime in November without the possibility of production. In spite of this fact, the termination agreement was sent October 21, 1952.

■ The defendant made every effort it possibly could in compliance with the directions of Change Order "I". It carried out the terms of its agreements and complied with all orders given to it by plaintiff. It manufactured approximately 3,600 boxes from its 9-ton supply of steel, delivered them to Ordnance, and was in the process of retooling when the contract was terminated. Termination at that time was unwarranted. It was a clear violation of the agreement and a breach of the contract on the part of the plaintiff. In United States v. Behan, 110 U.S. 338, at page 346, 4 S.Ct. 81, at page 85, 28 L.Ed. 168, an action instituted against the Government, it was said:

"But, surely, the willful and wrongful putting an end to a contract, and preventing the other party from carrying it out, is itself a breach of the contract * * *."

■ If a promissor is himself the cause of the failure of the performance of a contract condition, he cannot set up such non-performance as a breach of the contract. Tradewell Foods v. New York Credit Men's Adj. Bur., 2 Cir., 179 F.2d 567.

■ Plaintiff's contention (b) that the defendant failed to undertake in a workmanlike and efficient manner to comply with the requirements of Change Order "I" is specious, and the facts which I have outlined completely exonerate the defendant from this charge.

With respect to subdivision (c) that lack of adequate financing did not constitute an excusable delay, the chronological facts with respect to this point are not in dispute.

When Supplemental Agreement No. 2, dated January 31, 1952, was entered into, the defendant was entirely excused for unforeseeable delays in deliveries of material. At that point the defendant had been put to considerable expense not contemplated by the original agreement. As a result of talks and conferences, on February 19, 1952, the defendant prepared an invoice showing that the costs incurred by the defendant up to that time totaled $437,285.39 and requested some type of a partial payment. As I have pointed out in this opinion, there is not one scintilla of evidence which indicates that the plaintiff did not find that these were good incurred costs. The plaintiff's witnesses testified, in fact, that they were good incurred costs. A complete investigation was made by the plaintiff to determine whether or not they were good costs. I emphasize this point be-

cause of the fact that on March 3, 1952, Supplemental Agreement No. 3 was entered into which changed the original terms of the contract and provided for partial payments.

This agreement was the result of the position which the defendant found itself in at that time, entirely due to the fault of the plaintiff. The plaintiff recognized that the payment requested by defendant of $327,964.04 were good costs and was 75% of its original invoice of $437,285.39. Before executing Supplemental Agreement No. 3 the parties agreed that the plaintiff was to be allowed to deduct 1% of costs incurred as consideration for this agreement, and that sum was actually deducted, to wit, $3,279.64. The defendant had a right to expect and was entitled to the payment of $327,964.04, less $3,279.64. Instead, the plaintiff paid to the defendant approximately $150,000 and then later, on June 2, 1952, $56,786.08, on July 24, 1952, $80,244.24. These amounts were still short of the $327,964.04, and it must be borne in mind that between March 3, 1952, when this Supplemental Agreement No. 3 was entered into and the payment of $80,244.24 made on July 24, 1952, other costs were incurred by the defendant.

The amount of $36,862.55 was retained by the plaintiff for boxes already delivered which, with the sum of $3,279.64 retained, came to approximately $40,000. This suggests that on this financial question the defendant was always on the credit side of the ledger, but the plaintiff refused to recognize that fact. The plaintiff knew that Mastan Company, Inc., was financing the defendant and that these three payments made by the plaintiff went to the Mastan Company entirely.

In Section 206, Volume Nine of Williston On Contracts, Revised Edition, is found the following:

"Failure to make partial payments, on the part of the Government, as work progresses, is a breach of contract and justifies abandonment. * * *"

And in support thereof cites South Fork Canal Co. v. Gordon, 6 Wall. 561, 18 L.Ed. 894; Overstreet v. United States, 55 Ct.Cl. 154. Of similar import is Brooklyn & Queens Screen Mfg. Co. v. United States, 97 Ct.Cl. 532, a case similar in many aspects to the one at bar. There the Court held that the Government's refusal and failure to make progress partial payments in accordance with the terms of the contract between the plaintiff and the defendant constituted a breach of the contract.

The evidence indicates undisputedly that during the period between March 3d and July 24th $16,525.96 was charged to the defendant for liquidated damages for late delivery or non-delivery, although, for the life of me, I do not see how the plaintiff can urge it was entitled to any liquidated damages. Fines or penalties for delay or failure to deliver articles under a contract cannot be recovered if strict performance has been prevented or waived. District of Columbia v. Camden Iron Works, 181 U.S. 453, 21 S.Ct. 680, 45 L.Ed. 948. The execution of Supplemental Agreement No. 4 dated July 17, 1952, waived all defaults of the defendant and under the circumstances the defendant's obligations for liquidated damages were annulled up to that date.

I must find, therefore, that the plaintiff violated its Supplemental Agreement No. 3 and arbitrarily refused to recognize the terms of this agreement.

Change Order "I" was issued August 20, 1952. At the time this change order was issued defendant vigorously protested that its partial payment plan had not been lived up to by the plaintiff, and continuously requested that these payments be made. In spite of the failure of the plaintiff to comply with the terms of its financial agreement, nevertheless, the defendant began to comply with the directions under Change Order "I". It is significant that at the time that Change Order was issued, and while the defendant was protesting vigorously that the plaintiff had not made proper payments under Supplemental Agreement

No. 3, a new promise was made to the defendant. Captain LeBeau assured the defendant that all good costs incurred under Change Order "I" would be promptly paid. The plaintiff made two separate and distinct investigations while Change Order "I" was being effected, and all reports were to the effect that the retooling was progressing satisfactorily and that immediately upon the completion of this order production would flow freely. They also reported that approximately $120,000 were good incurred costs and that the defendant's request for payment of that amount was sound and should have been honored. Colonel Walker refused to make the payment. It is curious to note that while Colonel Walker refused to make the payment he directed the defendant to keep working on the retooling job, assuring the defendant that from his viewpoint it was the duty of the defendant to comply with this change order as the contract was in full force and effect.

Thus, we have an inconsistency in that, on the one hand, the defendant was directed to comply with plaintiff's directions under the agreement, but, on the other hand, the plaintiff refused to honor its terms of the agreement.

The cancellation notice was a clear violation of the agreement by the plaintiff. Not only did the plaintiff fail to make proper partial payments under Change Order "I" but canceled the agreement before the defendant was given a proper opportunity to finish the retooling necessary under this order.

I find, therefore, that there were three violations of the agreement by the plaintiff. It breached the terms of Supplemental Agreement No. 3 when it refused to make a partial payment of $327,964.04. It again breached its agreement with defendant when it refused to make partial payment of the invoice of August 31, 1952, which included good incurred costs of more than $120,000 under Change Order "I". It also breached the agreement by the service of the notice of termination on October 21, 1952, one

month before retooling could have been effected by the defendant, to wit, the latter part of November.

From the inception of the agreement between these parties the contracting plaintiff adopted a pattern. It required the defendant to adhere to every clause in the original agreement, the supplemental agreements, and all directions under the change orders. It treated all conditions of these various agreements and directions as obligatory upon the defendant. The defendant lived up to the terms of its agreement though the conditions at times became onerous and some of the directions completely unforeseeable and arbitrary. On the other hand, the plaintiff treated the obligations and duties it assumed under these various agreements and change orders as discretionary on its part. They were to be fulfilled at the will and in the manner required by it. The deduction of $16,525.96 in penalties for the period of time between March 3 and July 24, 1952, is but one example of the many unjustified exercises of power that the plaintiff adopted. Supplemental Agreement No. 4 dated July 7, 1952, waived all defaults of the defendant up to that date and, having waived all defaults, the assessment of these penalties by the plaintiff, therefore, was unwarranted.

The plaintiff contends that under its agreement with defendant it was entitled to the tools made by the defendant immediately upon the making of any partial payment. Presumably, its contention is that, irrespective of any violation or breach of agreement by the plaintiff, this clause was operative when the first partial payment was made. I cannot agree with this contention.

"It is a fundamental rule of contract law that one party, itself in substantial default, may not hold the other party to his contract, at common law." Weicker v. Bromfield, 10 Cir., 34 F.2d 377, 385. The Court of Claims in Brooklyn & Queens Screen Mfg. Co. v. United States, supra, quoted the follow-

ing from Pigeon v. United States, 27 Ct. Cl. 167, 175:

"The law requires the right of forfeiture to be exercised in strict performance of the power and in apt time. It cannot be founded upon a fault once forgiven, and upon the faith of which forgiveness the derelict party has ventured forward in the performance of his duty. * * "

Plaintiff is not entitled to recover possession or title to the tools made or acquired by the defendant because by its own acts it prevented the defendant from completing the contract.

It is my intention in this decision to decide the contractual obligations, duties, and rights under the agreement between the plaintiff and defendant on the merits in favor of the defendant.

[9]   With regard to the three counterclaims set up by the defendant, this Court has no jurisdiction of any claim against the United States exceeding $10,000 in amount, 28 U.S.C.A. § 1346(a) (2) and (c). The defendant in this action has demanded affirmative judgment on three separate counterclaims for damages arising out of the contract, each exceeding $10,000. This Court cannot entertain these counterclaims. There is now pending in the Court of Claims an action wherein the defendant here alleges that plaintiff breached the contract and, because of the breach, suffered large damages and, as I have disposed of all issues in the instant case except damages, that feature must be reserved for the Court of Claims. I, therefore, must dismiss these counterclaims but without prejudice to their prosecution in that Court. See United States v. Shaw, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888, and United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894.

Submit findings of fact, conclusions of law, and a decree in accordance with this opinion.

### On Motion to Set Aside

The plaintiff instituted this action to recover certain materials, machinery, and equipment, and to recoup the sum of $149,118.38 as partial payments advanced by it to the defendant, Lennox Metal Manufacturing Company, Inc., hereinafter referred to as Lennox, a company whose affairs were being operated by a trustee appointed pursuant to Chapter 10 of the Bankruptcy Act. The action of the plaintiff was predicated upon an alleged default by defendant in the performance of a contract which as modified by four supplemental agreements and ten change orders obligated Lennox to manufacture, furnish, and deliver to the Government a quantity of 50-caliber ammunition boxes. Lennox by its answer denied the allegations of the complaint, set up separate defenses, and interposed three separate counterclaims seeking damages arising out of the matters involving the four supplemental agreements and the ten change orders.

On February 2, 1954, an opinion was rendered which in effect denied the plaintiff the right to recover possession of items of property sought to be recovered by the plaintiff, all of the partial payments made, and dismissed the defendant's counterclaims on the ground that this Court had no jurisdiction of them in that each counterclaim exceeded a recovery in excess of $10,000 in amount. These counterclaims were dismissed pursuant to Title 28 U.S.C.A. § 1346(a) (2) and (c). Thereafter, and on April 6, 1954, findings of fact, conclusions of law, and a decree were entered in the office of the Clerk of this Court.

The plaintiff now moves for an order setting aside the findings of fact, conclusions of law, and the judgment on the following grounds:

(1) The Court erred in ruling that the determination of the Contracting Officer in refusing to make the partial payments applied for by Lennox Metal Manufacturing Company, Inc., was a breach of contract on the part of the United States of America.

(2) The judgment entered herein is contrary to law, in that it fails to give effect to the provisions of the

Standard "Disputes" Clause (Article 12) agreed to by the parties herein, which vested in the Contracting Officer the authority to determine any dispute of facts between the parties.

(3) The Court failed to apply and follow the principles declared by the Supreme Court in United States v. Wunderlich, 342 U.S. 98 [72 S.Ct. 154, 96 L.Ed. 113], as to the finality and conclusiveness of the determination of the Contracting Officer under Article 12 of the contract in the absence of an appeal to the Secretary which was the only review provided for in the contract.

The opinion explored in detail the claims advanced by the plaintiff and the defenses interposed by the defendant, and the Court sees no reason for changing the conclusions reached on the facts and the law.

The plaintiff predicates its motion on the "Disputes" clause of the contract which provides as follows:

"12. Disputes

"Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within thirty days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative from the hearing of such appeals shall be final and conclusive: Provided, that if no such appeal is taken, the *decision of the Contracting Officer shall be final and conclusive.* In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. *Pending final decision of a dispute hereunder, the*

*Contractor shall proceed diligently with the performance of the contract in accordance with the Contracting Officer's decision.* (Italics supplied.)

The memorandum submitted in support of the present motion advances the following claims:

Point I—The Determinations of the Contracting Officer as to Issues of Fact Require a Decision for the United States of America.

Point II—The United States of America Did Not Breach This Contract.

Point III—Fraud Must Be Alleged And Proven To Be a Defense to the Findings of Fact Made by the Contracting Officer.

Point IV—In the Absence of a Contrary Decision on Appeal the Decision of the Contracting Officer Is Final and Conclusive.

Point V—Lennox Metal Manufacturing Company, Inc., Has Not Exhausted Its Administrative Appeal Procedure.

These five points are somewhat interwoven and the Court will endeavor to touch upon each one.

Plaintiff contends that under the provisions of the "Disputes" clause the Contracting Officer's decision was final and conclusive until the rendition of a contrary determination on appeal and that the failure of the defendant to exhaust the administrative appeal procedure of the "Disputes" clause voided any possible finding in favor of Lennox by reason of the Supreme Court's decision in United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113, and other related cases.

There are several answers to plaintiff's contention. The plaintiff commenced this action alleging a breach of contract on the part of the defendant and sought to invoke a clause in the partial payment agreement which in effect provided that title to certain materials, machinery and equipment, inventory and nondurable tools vested *ipso facto* in the

plaintiff by virtue of the alleged breach on the part of Lennox.

After a protracted trial and the taking of hundreds of pages of testimony in support of the plaintiff's contention and the defenses of Lennox, an opinion was rendered by this Court reviewing the history of the entire controversy based upon the facts and the law. Findings of fact and conclusions of law were submitted and signed and a decree was entered holding that the plaintiff and not the defendant breached its agreement and, therefore, was not entitled to any of the relief it sought. The brief submitted by the plaintiff after trial contained 14 points. The claim now raised by this motion was not alluded to or made a basis for the Court's decision and, while several clauses in the contract were necessarily construed, the "Disputes" clause with respect to the Contracting Officer's final decision and the appeal provisions was not stressed nor called to the Court's attention until the presentment of the present motion.

In instituting its action the plaintiff sought relief in this Court voluntarily and, after a decision had been rendered against it, it raises this issue for the first time. The plaintiff having chosen its forum and submitted the facts and law for a decision by this Court, it has waived its right to set up this claim for the first time. It certainly is estopped from doing so at this late date in that having been non-suited, which was contrary to its expectations, the plaintiff now in effect claims that this Court to all intents and purposes wasted its time because there was a clause in the contract that barred the defendant from any rights in this Court. The plaintiff after litigating its claim here and, having received an adverse decision, in effect now says that is of no avail and that the entire matter must be sent back to the Board of Contract Appeals for a review of the Contracting Officer's determination. The plaintiff's position to say the least is inconsistent for, if the plaintiff's contention be tenable, it could win but not lose.

There is still another answer to that particular contention. After the Contracting Officer terminated the contract the defendant, Lennox, sought a review pursuant to the contract. A week after the termination of the contract by the Contracting Officer, Lennox on November 7th served upon the Secretary of the Army and the New York Ordnance District a notice of appeal appealing from the decision of the Contracting Officer pursuant to Article 12 of the contract. It is not disputed that this appeal was served and that it was timely. Rule 4(c), promulgated by the Board of Contract Appeals, provides:

"C. Trial briefs. Counsel for the government shall thereafter file with the Board a memorandum asserting the factual and legal issues which counsel for the government considers may be involved in a hearing upon the appeal. A copy of the memorandum shall be forwarded by counsel for the government to the contractor, who shall twenty days, or such longer time as the Board may allow in which to submit a reply memorandum. The case will thereafter be in order for hearing."

The evidence before me indicates clearly and is not disputed by the plaintiff that Lennox sought a review of the Contracting Officer's termination. The evidence further indicates and is not disputed by the plaintiff that nothing was done with respect to Rule 4(c). Obviously, when the plaintiff commenced this action it undoubtedly knew that this action would take the place of the Contracting Officer's decision and the appeal therefrom. The Contracting Officer, as Lennox aptly points out, made it impossible for the attorney for Lennox to prepare a memorandum asserting the factual and legal issues to be considered upon appeal and, this being so, if this constitutes the sole appeal procedure, then obviously in the instant action the appeal procedure was not only grossly inadequate but unavailable to the defendant because the Contracting Officer refused

to make a record and simply sat and let time tick away.

After the Wunderlich case, supra, was decided by the Supreme Court and it became evident that this particular type of "Disputes" clause in government contracts was onerous to contractors, stifling any chance of redress from the Government that might be warranted, Congress enacted Public Law 356, 83d Congress, Chapter 199, 2d Session, S. 24, which provides as follows, 68 Stat. 81, 41 U.S.C.A. §§ 321, 322:

*"To permit review of decisions of the heads of departments, or their representatives or boards, involving questions arising under Government contracts.*

*"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That no provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: Provided, however, That any such decision shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.

"Sec. 2. No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board.

"Approved May 11, 1954."

The report with respect to this bill, known as House Report No. 1380 of March 22, 1954, and Senate Report No. 32, February 4, 1953, contains some illuminating language as to what Congress intended by this particular bill. It quoted from a decision of the Court of Claims in Palace Corp. v. United States, 110 F.Supp. 476, 478, 124 Ct.Cl. 545, 549:

"Until the time of the decision in that case (Wunderlich), this court had reviewed the contracting officer's decision when it was shown to be arbitrary, capricious, or so grossly erroneous as to imply bad faith, notwithstanding the parties had contracted that all matters of disputed fact might be decided by one of the parties to the contract. Such a provision we had understood called for the highest good faith on the part of the interested party making the decision." U.S.Code Cong. and Adm. News 1954, p. 2193.

The Wunderlich case, supra, followed the decision in United States v. Holpuch Co., 328 U.S. 234, 66 S.Ct. 1000, 90 L.Ed. 1192, which determined the effect of the failure of a contractor to abide by the appeal provisions of a "Disputes" clause. The bill apparently was intended to wipe out the inequities of a clause such as was found in controversy in this suit. Again quoting from the reports with respect to this bill:

"A principal change which the amendment effects in S. 24 is to restore the standards of review based on arbitrariness and capriciousness. These have long been recognized as constituting a sufficient basis for judicial review of administrative decisions, a reference to capricious action on the part of a Government contracting official vested with discretionary power of decision being found as early as 1911 in the decision of the Supreme Court in Ripley v. United States, 223 U.S. 695, 32 S.Ct. 352 [56 L.Ed. 614]. The standards of arbitrariness and capriciousness in relation to the review of administrative action were also prescribed in the Administrative Procedures Act (act of June 11, 1946, ch. 324, sec. 10, 60 Stat. 243, 5 U.S.C. § 1009 [5 U.S.C.A. § 1009]). There is a

wealth of judicial precedent behind these standards of review and it is the committee's belief that they should not be abandoned.

"The proposed amendment also adopts the additional standard that the administrative decision must be supported by substantial evidence. The requirement that administrative action be supported by substantial evidence is found in the Administrative Procedures Act, supra. As understood by the committee and as interpreted by the Supreme Court in Consolidated Edison Company of New York v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206 [83 L.Ed. 126], 'substantial evidence' means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

In interpreting the Wunderlich and Holpuch cases, supra, it must be borne in mind that the contractors instituted the actions. In the present action the reverse is true—the Government commenced the action which compelled Lennox of necessity to defend itself. To that extent the cases cited are not quite analogous to the situation presented to this Court.

Point II urged in this motion is to the effect that the United States of America did not breach this contract. The Court found otherwise and adheres to its former decision.

Point III—fraud must be alleged and proven to be a defense to the findings of fact made by the contracting officer. The Court reiterates that the plaintiff sought relief in this Court and it was the duty of this Court to decide the contractual obligations, duties and rights of the plaintiff and defendant, irrespective of any question of fraud although the testimony revealed that during the time the contract was in being the conduct of the New York Ordnance District with the defendant was capricious, arbitrary and so grossly erroneous that it spelled out not only bad faith but gross fraud. Had the appeal procedure been available to Lennox it might have established facts with respect to fraud, capriciousness or erroneous judgment on the part of the Contracting Officer in arriving at his determination, but because of his or his counsel's inaction in strictly complying with the provisions of Rule 4(c) it was impossible for the defendant to assert these defenses before the Board of Contract Appeals. This inaction vitiated the obtaining of any possible right of redress by the defendant on appeal. It is inconceivable that any right of redress depended solely upon the Government's compliance with its own rules and regulations. Nevertheless, that is exactly what occurred. The Government's inaction was a complete denial of justice to the defendant in that it never had an opportunity to prove the real facts before the Appeals Board. This was wholly inequitable and a mockery on the administration of justice because by failing to follow the appeal procedure provided in Rule 4(c) the Contracting Officer could make a determination that was final and then foreclose an appeal from his determination.

However, notwithstanding a denial of justice to the defendant, the plaintiff chose this forum to determine the equities between it and Lennox and, having elected to try its case in this Court, it is a bit late to now say in effect, "We are not satisfied with this Court's decision and think that we will go elsewhere."

Point IV is to the effect that in the absence of a contrary decision on appeal the decision of the Contracting Officer is final and conclusive. Point V points out that Lennox has not exhausted its administrative appeal procedure. Both of these claims are pursuant to Article 12 of the contract. The facts alluded to in this opinion apply equally with full force and effect to both of these claims. Plaintiff never attempted or intended to afford the defendant an opportunity to review the Contracting Officer's decision. Commencement of this action in this Court amply corroborates that conclusion.

**734**

Points I, III, IV and V of the memorandum and the claims set forth in the motion to all practical purposes and effect ask this Court now, after an adverse decision to the plaintiff, to send this whole controversy back to the Board of Contract Appeals for a review of the Contracting Officer's decision. A decision to that effect now would give the plaintiff practically two trials of the same issue. Thus, the plaintiff would gain an advantage that is wholly inequitable and contrary to logic for the plaintiff was not forced to come into this Court, whereas, as has been said before, it voluntarily chose this forum. There is no question of the right of the plaintiff to bring its action in this Court. It is bound by the decision made here.

For these reasons the motion is denied.